Informal claims for refund have been recognized when, at a minimum, a showing has been made that the purposes of a formal claim for refund have been fulfilled. See United States v. Kales, 314 U.S. 186, 62 S.Ct. 214, 86 L.Ed. 132 (1941). In Newton v. United States, 163 F.Supp. 614, 619, 143 Ct.Cl. 293, 300, (1958), this court outlined the critical requirement for a valid informal claim for refund:

> * * * The basic underlying principle is the necessity to put the Commissioner on notice of what the taxpayer is claiming and that he is in fact making a claim for refund. * *

 Plaintiffs Jerome and Shirley Gage did not transmit any written document to the Internal Revenue Service protesting the taxes collected for the years 1958 through 1961. It certainly cannot be presumed that the Commissioner of Internal Revenue is on notice of the filing of informal claims for refund for prior years (the taxes and interest on which having been collected some two years before) merely by auditing a return for a later year involving the same issue. We do not state here the rule as to what will amount to a sufficient showing of an informal claim for refund. Each case will undoubtedly present its own curious blend of facts and circumstances. We do hold that, as a matter of law, the Commissioner cannot be deemed to have received an informal claim for refund for earlier years by the mere fact of auditing the taxpayers' return of a later year involving the same issue.[13]

The identical situation applies with respect to the audit of the 1962 return of Ralph H. and Nell D. Gage.[14] Insofar as Clifton L. and Jane G. Brigham as well as Charles F. and Margaret B. Jarrard are concerned, an even weaker case is presented. These taxpayers were not even audited for 1962. To argue, as do these particular plaintiffs, that informal claims for refund were filed on their behalf for the years 1958 through 1961 by virtue of the audit for the year 1962 of another shareholder in the Gage corporation leads us even further afield. Their cases being even more tenuous than that of Jerome and Shirley Gage, none of the other plaintiffs may prevail on the theory of informal claims for refund.

For the foregoing reasons, defendant's motion for judgment on the pleadings is granted and the petitions are dismissed.

**RALLS, INC.**

v.

**The UNITED STATES.**

No. 257–68.

United States Court of Claims.

Dec. 12, 1972.

---

13. See American Radiator & Standard Sanitary Corp. v. United States, 318 F.2d 915, 920, 162 Ct.Cl. 106, 113–114 (1963), where we said:

 "* * * Informal refund claims have long been held valid * * *. But they must have a written component (Sicanoff Vegetable Oil Corp. v. United States, 181 F.Supp. 265, 149 Ct.Cl. 278, 286 (1960) ;) * * *, and should adequately apprise the Internal Revenue Service that a refund is sought and for certain years. * * * It is not enough that the Service have in its possession information from which it might deduce that the taxpayer is entitled to, or might desire, a refund; nor is it sufficient that a claim involving the same ground has been filed for another year or by a different taxpayer. Rosengarten v. United States, * * * [181 F.Supp. 275, 149 Ct.Cl. 287 (1960), cert. denied, 364 U.S. 822, 81 S.Ct. 60, 5 L.Ed.2d 53]."

14. Petitioners' allegations are even more unclear with respect to when the audit for the 1962 years was commenced. Again, we do not need to reach this factual question.

Joseph J. Lyman, Washington, D. C., Atty. of record, for plaintiff.

Ira Mark Bloom, Washington, D. C., with whom was Asst. Atty. Gen. Scott P. Crampton, for defendant.

Before COWAN, Chief Judge, and DAVIS, SKELTON, NICHOLS, KASHIWA, and KUNZIG, Judges.

## OPINION

PER CURIAM:

This case was referred to then Chief Trial Commissioner Marion T. Bennett (now a Judge of this court) * with directions to make findings of fact and recommendation for conclusions of law under the order of reference and Rule 134(h). The report of Judge Bennett, sitting as a commissioner of the court's trial division (28 U.S.C. § 2505), consisting of his opinion, findings of fact and recommended conclusion of law, was filed on August 23, 1972. On September 22, 1972, defendant filed a notice of intention to except to the said report but on November 2, 1972, requested leave to withdraw its notice of intention to except and such leave was subsequently granted. On November 6, 1972, plaintiff filed a motion requesting that the court adopt the said report. The case

* See fn. following.

has been submitted to the court for its consideration (with Judge Bennett not participating) without oral argument. Since the court agrees with Judge Bennett's opinion, findings of fact and recommended conclusion of law, as hereinafter set forth, it hereby grants plaintiff's motion to adopt and adopts the same as the basis for its judgment in this case. Therefore, it is concluded that plaintiff is entitled to recover for the third quarter of 1963; for 1964; for the first quarter of 1965 but not for the last three quarters of that year; for 1966; and for 1967, with judgment entered accordingly and with the amount thereof to be determined pursuant to Rule 131(c)(2).

## OPINION OF JUDGE BENNETT
### (Sitting as a Trial Commissioner)

BENNETT, Judge:*

This is another of the several tax cases considered by the court in which the sole issue for determination is whether certain mechanics, known in the trade as "applicators," who rendered home improvement services for the plaintiff, were its "employees" for federal employment tax purposes. The suit seeks recovery of taxes claimed to have been wrongfully paid on the earnings of the applicators under the Federal Insurance Contributions Act (FICA), 26 U.S.C. § 3101 et seq. (1964), and the Federal Unemployment Tax Act (FUTA), 26 U.S.C. § 3301 et seq. (1964). By stipulation of the parties, the case is presently limited to the issue of whether or not plaintiff is entitled to recover. The determination of the amount of recovery, if any, is reserved for further proceedings, as permitted by Rule 131(c).

The statutes define both what an employee is and what he is not. An employee is "any individual who, under the

usual common law rules applicable in determining the employer-employee relationship, has the status of an employee * * *." 26 U.S.C. § 3121(d)(2). The term "employee" does not include:

(1) any individual who, under the usual common law rules applicable in determining the employer-employee relationship, has the status of an independent contractor, or

(2) any individual (except an officer of a corporation) who is not an employee under such common law rules. [26 U.S.C. § 3306(i) (1964).]

 In applying the common law test it must be remembered that different considerations and legislative purposes distinguish these FICA and FUTA cases, where the worker is not a party, from suits under liability and compensation acts where the economic reality test may be applied. Further, these cases turn on their facts. The facts furnish many guidelines to help determine whether or not a common law relationship of employment exists but no one factor is controlling and the relationship must be ascertained by an over-all view of the entire situation. However, the degree of control exercised by the principal over the worker is the most significant single factor. In determining whether or not there was control, it has been held that the principal, plaintiff here, must have had the right, whether exercised or not, to control not only the result to be accomplished but also the manner in which the work was to be performed. If such control existed, the worker has been held to be an employee for tax purposes. The foregoing rules have been laid down in the pertinent Treasury regulations, 26 C.F.R. §§ 31.-3121(d)-1, 31.3306(i)-1(b)-(d), and by many cases collected most recently in this court by the opinions in William C.

---

* This case was referred to Chief Commissioner Marion T. Bennett for trial proceedings and report pursuant to Rule 134 (h). After trial, but before his findings of fact and recommendation for conclusion of law could be submitted to the court, he was nominated by the President, confirmed by the United States Senate, and took the oath of office as an associate judge of the Court of Claims. This report, therefore, is submitted to the court by Judge Bennett sitting as a commissioner of the court's trial division. 28 U.S.C. § 2505.

McCombs Co. v. United States, 436 F.2d 979, 193 Ct.Cl. 644 (1971), and Powers v. United States, 424 F.2d 593, 191 Ct. Cl. 762 (1970). It would serve little useful purpose here to repeat those discussions and the distinctions in the cases for the rules announced are clear and now well established. They were fully developed in the excellent briefs of counsel in the present case.

The particular difficulty with the instant case is that it covers a timespan commencing with the last quarter of the calendar year 1963 and extending through the year 1967. Within that span of time is a period represented by the last three quarters of 1965 in which the relationship between plaintiff and the applicators differed in marked degree from the rest of the period. Defendant would use this fact to color the whole case. Defendant would also seek to establish that the conduct of plaintiff's predecessors in the business established an employer-employee relationship prior to the period in issue here and that this relationship did not change. These are not found to be the facts, however, upon a careful study of the record. For reasons appearing hereinafter, plaintiff's claim is allowed except as to the contested three quarters of 1965.

■ Plaintiff, a Kansas corporation doing business in Wichita and surrounding territory, was engaged in home repairs. As such, it did reroofing and applied siding to residential properties. The work was actually done for plaintiff by men known in the trade as applicators. Plaintiff, incorporated in August 1963, was successor to E. F. Ralls Roofing Co., founded in 1938, and to R. L. Ralls, a proprietorship. E. F. Ralls was the father of R. L. Ralls and the two became partners in 1953. The latter bought out the business in 1962 and is now president of plaintiff and the principal owner. Plaintiff was and is a licensed contractor and carries workmen's compensation and public liability insurance.

Without repeating the detailed facts set forth in the findings, the essential elements of plaintiff's customary method of business can be summarized. Written contracts for work to be done were obtained from homeowners by commission salesmen working for plaintiff who guaranteed materials and workmanship. The work to be done was then set forth on a work order which specified, also, the materials to be used and the price to be paid the applicator who accepted the work order. Sometimes the starting and completion dates were stated.

Any applicator deemed by plaintiff to be sufficiently experienced could accept the work order. Such applicators were free to accept work from plaintiff's competitors. They were paid upon completion of the work and were required to correct any faulty work without additional compensation. Plaintiff considered that acceptance of a work order constituted a contract and that the applicator was a subcontractor.

Applicators worked on a piecework basis by which is meant that they were paid on the basis of the number of "squares" of material applied at a rate per square fixed by plaintiff in consideration of prevailing area rates. Unusual jobs were negotiated as to price. Minor repair work which could not be measured by the square was paid for at an hourly rate. Plaintiff did not actively supervise the applicators but depended upon their experience to satisfy the customer and to comply with terms of the work order. The nature of the work also was such as to require no supervision, assuming an applicator was experienced.

Plaintiff drew up a document entitled Work Agreement By and Between Applicators and Sub-Contractors and Ralls, Incorporated. It was posted in plaintiff's office and applicators were urged to read it. This document stated:

It is understood and agreed by and between Ralls, Inc. and the applicators and sub-contractors that the following

work conditions exist by and between the two parties.

There followed a statement that plaintiff was the prime contractor and would pay an agreed contract amount; that no funds would be advanced on incomplete work or paid over until the job was finished; payment would not be as salary or by an hourly rate; amounts paid were to be agreed upon in advance for each job; plaintiff reserved the right to reject work that did not live up to the manufacturer's specifications; applicators and subcontractors were to furnish all equipment necessary to install the materials; Ralls, Inc., was not responsible for transportation of personnel to and from the jobsite; "[a]pplicators and sub-contractors shall be considered as their own representative of whose time and working hours and conditions are their own"; extra help used by applicators and subcontractors was their own responsibility; Ralls, Inc., would deliver all required materials to the jobsite; no one was guaranteed a minimum amount of work or was to be eligible for bonuses, pensions or sick pay and all "may terminate their services at any time they so desire upon completion of the work they are involved in." This document concluded by stating:

> I have read and do thoroughly understand everything contained in this agreement by and between applicators and sub-contractors and Ralls, Inc. and have indicated so by signing a work acknowledgement record card.

These cards were not offered into evidence.

The Work Agreement posted by Ralls, Inc., differed from the Employee Agreement used earlier by plaintiff's predecessors and which, signed by 54 applicators, clearly spoke in terms exhibiting an employer-employee relationship. It is found that although many of the practices under the two agreements were similar. the Work Agreement correctly stated plaintiff's policy and practice toward applicators during the period now in issue. There were minor exceptions

to the terms of the so-called Work Agreement in that plaintiff on occasion would make advance payments on incomplete work, loan a tool, or furnish a large truck for cleanup operations. But, applicators did not by their appearance, clothing, insignia or conduct hold out in any way that they were plaintiff's employees. When, on rare occasions, an applicator's work was not to plaintiff's satisfaction, plaintiff considered it a breach of contract and would remove the applicator from the job. Sometimes applicators left of their own accord and without notice.

On occasion, plaintiff's president would visit a jobsite to see if a job was progressing in accordance with the contract. However, plaintiff did not employ supervisors to observe, instruct or direct applicators how to do their work. Plaintiff relied upon the experience and competence of those selected to do the work and did not visit every job while it was in progress.

The typical applicator was not a licensed contractor such as plaintiff. However, some were licensed. The latter are not in issue here. Unlike licensed applicators, those who were unlicensed did not have offices, advertise for business or carry insurance. Plaintiff withheld taxes on these unlicensed applicators and the four who testified considered themselves plaintiff's employees partly for this reason but none of them showed any understanding of the technical application of this term in a tax case. They just considered that they were employees of whoever paid them. Tax withholding was not a popular thing with plaintiff's applicators. Plaintiff experienced difficulty in getting these men to work because plaintiff's competitors did not withhold.

On March 25, 1964, at a time when plaintiff had only three applicators at work, although plaintiff had used as many as 25, plaintiff requested a ruling respecting their status for employment tax purposes. The request was supplemented by affidavits of the three applicators who considered that they were in-

dependent contractors because two held licenses, all were the judges of their own time to work, were paid by agreement instead of hourly wages, and furnished their own tools and helpers.

On September 15, 1964, the Internal Revenue Service, after investigation, ruled that the applicators were plaintiff's employees and that this determination was applicable also with respect to the status of other individuals performing services for plaintiff under similar circumstances and conditions. The main basis of the ruling was a conclusion that plaintiff exercised or had the right to exercise over the applicators the control necessary under the usual common law rules to establish the relationship of employer and employee. The facts found by the Internal Revenue Service upon which the ruling was based do not at all support the ruling but are in direct refutation of it. Further, defendant has conceded for the purposes of the instant suit that independent contractors are not involved. Two of the three applicators involved in the request for ruling were independent licensed contractors, as noted above, and the other was not shown to be controlled by plaintiff as to the methods used to do a job. The ruling was clearly erroneous.

Reference is next made to the so-called Hilltop job. Plaintiff obtained a contract to do work for the Hilltop Manor Mutual Housing Corporation in 1965. This property consisted of about 100 multiplex residential units rented to shareholders by the housing corporation. This was plaintiff's largest contract and the work commenced in April 1965 and was completed in January 1966.

Because of the size of the project and the need to work on several units at the same time, plaintiff required more applicators than usual. Plaintiff had difficulty finding the number needed and advertised for help, offering steady work at $200 per week. The usual method of paying applicators by the square did not prove satisfactory at Hilltop so plaintiff drew up an Employment Agreement establishing set prices per unit. This agreement was signed by 45 applicators. It also provided, among other things, for a forfeit for wasting materials, prohibited advance payments before completion of work or the end of a regular pay period established as of Saturday noon, and the cost of corrections was to be deducted frcm "wages" due applicators. Plaintiff's president testified that plaintiff's relationship under this agreement was the same as under the Work Agreement. The weight of the evidence is to the contrary and the terminology of the employment agreement itself negates such testimony. It is true that there were some similarities. Work orders were used as before; applicators worked on a job-to-job basis; they set their own hours of labor and furnished their own equipment. As to the latter point, however, there were significant exceptions at Hilltop and a few applicators were permitted to use plaintiff's siding cutters for the duration of their employment at Hilltop.

Perhaps the most serious problem plaintiff encountered at Hilltop was with the tenants who had a very possessive attitude toward the units in which they lived. They complained about the colors of siding selected for their units, about the applicators stepping on their flower beds and interfering with electrical cables, awnings and fences. Some cursed the applicators and turned the garden hose on them. The applicators did not take kindly to this abuse and Hilltop's official job inspector testified that they came and went "like a revolving door." In fact, only one applicator continued throughout the course of plaintiff's contract with Hilltop Corporation. Plaintiff's difficulty in establishing peace with the tenants, the turnover in the staff of applicators, the incompetence and lack of experience of some of the applicators and the necessity to have some of their botched work redone, all required that plaintiff's president and his father give close, diligent supervision to the large Hilltop job. Plaintiff promised the Hilltop Corporation that he would "personally see that my employees conduct themselves as gentlemen or they will be discharged,"

and that he would devote his "personal attention to the job." Mr. Ralls kept his promises and by careful daily inspections made sure that sloppy work, missing nails, broken materials, misaligned siding and other deficiencies were taken care of and that inexperienced applicators were shown how to proceed properly.

Upon careful consideration of the entire record, it is concluded that while plaintiff retained the right at all times to control the result of work contracted for, and on which applicators were used, plaintiff did not exercise direction and control over the manner and method of the applicators' performance nor retain the right to do so except for the last three quarters of the calendar year 1965 of the total period involved in this case commencing with the third quarter of 1963 and extending to the first quarter of 1967. Upon these facts and the authority of *McCombs* and *Powers, supra,* and the cases and regulations collected there, plaintiff is entitled to recover except for the last three quarters of 1965 during which time the applicators working for plaintiff were common law employees for purposes of the taxes here at issue.

**ECONOMY PLUMBING & HEATING CO., INC., et al.**

v.

**The UNITED STATES.**

No. 226–65.

United States Court of Claims.

Dec. 12, 1972.